UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

DANA MOBIUS and HANS MOBIUS,    )
                                )
            Plaintiffs,          )
                                )
      v.                         )
                                )       Case No. 1:19-cv-00499
QUEST DIAGNOSTICS CLINICAL       )
LABORATORIES, INC., QUEST        )
DIAGNOSTICS INCORPORATED, QUEST  )
DIAGNOSTICS OF PENNSYLVANIA INC.,)
QUEST DIAGNOSTICS HOLDINGS       )
INCORPORATED, and JOHN DOE #1,   )
                                )
            Defendants.          )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' EXPERT
NEAL BLAUZVERN AND DENYING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**
(Doc. 75)

Plaintiffs Dana Mobius ("Ms. Mobius") and Hans Mobius ("Mr. Mobius," or collectively with Ms. Mobius, "Plaintiffs") bring this action against Defendants Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Incorporated, Quest Diagnostics of Pennsylvania Inc., Quest Diagnostics Holdings Incorporated, and John Doe #1 (collectively, "Defendants"), alleging that on November 2, 2015, John Doe #1 negligently drew Ms. Mobius's blood at one of Defendants' locations in Orchard Park, New York, "causing [her] severe, serious[,] and permanent injuries." (Doc. 1–2 at 9, ¶ 25.) Plaintiffs assert three causes of action: (1) medical malpractice; (2) failure to obtain Ms. Mobius's informed consent; and (3) loss of consortium on behalf of Mr. Mobius as a result of Ms. Mobius's injuries.

Pending before the court are Defendants' January 31, 2023 motion to strike Plaintiffs' expert Neal Blauzvern, D.O. ("Dr. Blauzvern"), and motion for summary

judgment. (Doc. 75.) After receiving leave from the court to file an untimely response, Plaintiffs opposed the pending motions on March 27, 2023. (Doc. 89.) Defendants replied on April 7, 2023 (Doc. 91), at which time the court took the motions under advisement.

Plaintiffs are represented by Anne B. Rimmler, Esq., Philipp L. Rimmler, Esq., Elizabeth Katherine Bacher, Esq., and William A. Quinlan, Esq. Defendants are represented by Michael T. Hensley, Esq., Lauren Elizabeth Fenton-Valdivia, Esq., V. Christopher Potenza, Esq., and Patrick B. Curran, Esq.

I.    **Whether to Strike Plaintiffs' Expert Dr. Blauzvern.**

Plaintiffs seek to introduce the expert opinion of Dr. Blauzvern in support of their claim that Defendants negligently performed Ms. Mobius's blood draw on November 2, 2015. Defendants ask the court to strike Dr. Blauzvern's opinion on the grounds that his recently disclosed opinions are untimely. Pursuant to Fed. R. Evid. 702, they further argue he is not qualified to opine regarding the applicable standard of care for blood draws and whether that standard of care was breached.

Dr. Blauzvern is a Doctor of Osteopathic Medicine who is board-certified in anesthesiology and licensed by the State of Texas to practice anesthesiology and pain management. He has more than thirty years of experience in those fields. In 1983, he graduated from the New York College of Osteopathic Medicine before completing an internship in internal medicine at Long Island College Hospital and a residency and fellowship in pain management and pediatric anesthesiology at the State University of New York at Stony Brook.

Dr. Blauzvern practiced at the Pain Management Practice of Central Texas Spine Institute from 1994 until 2016, when he began practicing at the Capitol Pain Institute in Austin, Texas. Since 2018, he has served as the medical director for the Center for Speciality Surgery.

Dr. Blauzvern's current clinical practice focuses on pain management, including diagnosing and treating chronic regional pain syndrome ("CRPS"). Although he treats patients with all types of pain, including pain associated with nerve injuries, he is particularly interested in spinal cord stimulation, neuropathic pain, and pediatric pain. In

his previous practice, Dr. Blauzvern administered "all types of anesthesia" and supervised nurses and anesthesia students. (Doc. 75 at 8, ¶ 25.)

It is "very rare" that Dr. Blauzvern or any other doctor performs blood draws at the Capitol Pain Institute, because they "attempt, as a surgery center, to have all of that preoperative evaluation done ahead of time" and "blood is just not drawn there." (Doc. 75-5 at 12-13.) Dr. Blauzvern does not recall the last time he performed a blood draw. He believes that it has been "[p]robably months to years" since he last performed a blood draw, although he "do[es] start IVs . . . , which is basically the same technique." *Id.* at 12. He remembers performing one blood draw during 2022 but cannot approximate how many times he performed blood draws in the five years prior to 2022 because "[i]t's just a very routine kind of thing" and "[i]t's just not . . . an event, it's not an action, it's not a clinical duty that registers as anything special that I would remember to any extent." *Id.* at 13. In his previous position at the Central Texas Spine Institute, he "was responsible" for performing blood draws and starting IVs for his patients when necessary, although he does not remember how frequently he did so. *Id.*

Dr. Blauzvern testified in deposition that he received training in performing blood draws and starting IVs during medical school, which he attended from 1979 to 1983, and as part of his residency from 1984 to 1986, and of his fellowship from 1986 to 1987. He has not received further phlebotomy training or been licensed as a phlebotomist or nurse. He has not attended any phlebotomy conferences, given presentations on venipuncture, or read or drafted any publications[1] or standard operating procedures on blood draw requirements for phlebotomists.

Dr. Blauzvern is unaware of whether Capitol Pain Institute maintains any policies related to venipuncture performance. He has not reviewed any venipuncture performance policies at the local hospitals where he maintains privileges, nor has he participated in drafting standard operating procedures related to venipunctures. He has never supervised phlebotomists or managed a medical laboratory.

---

[1] Dr. Blauzvern's sole publication is an article he published in 1989 entitled "Effects on Pain Reduction and Simple Reaction Time – A Preliminary Report." (Doc. 75-5 at 9.)

Although Dr. Blauzvern has served as an expert witness in cases related to nerve injuries and CRPS, he has not served as an expert witness, provided an expert report for, been deposed in, or otherwise reviewed any cases related to phlebotomy. No court has qualified him to serve as an expert on the standard of care for a phlebotomist performing a blood draw. There is no evidence that he has practiced osteopathic medicine in New York after his fellowship or that he remains knowledgeable regarding the phlebotomy standard of care in New York, although he contends the standard of care is a national one.

Dr. Blauzvern opined that Ms. Mobius's November 2, 2015 blood draw breached the venipuncture standard of care because the phlebotomist who performed the blood draw did not use a tourniquet; caused injury to the surrounding nerves and tissues; and failed to immediately withdraw the needle when Ms. Mobius complained of severe pain. Because the phlebotomist did not use a tourniquet, Dr. Blauzvern opined that "the location of the venipuncture, towards the top of the forearm, did not follow the standard of care either." *Id.* at 32 (internal quotation marks omitted). He concluded that the blood draw caused severe and permanent nerve injury to Ms. Mobius, which developed into CRPS.

In opposition to the pending motions, Plaintiffs submitted a sworn Declaration from Dr. Blauzvern dated March 27, 2023 (the "March 2023 Declaration"), in which he averred:

> Venipuncture for blood sampling is a basic medical procedure, and the related standards of care are universal. Anesthesiologists, such as myself, as well as many other medical professionals, aside from Phlebotomists, regularly perform such blood draws. . . . Most notably, medical professionals of all types must follow the same standard of care when conducting such venipunctures, including blood draws. Thus, a Phlebotomist must adhere to the very same protocol and standard of care as I do as an Anesthesiologist. By virtue of my knowledge and familiarity with the applicable medical literature and the procedure to be followed, as well as the fact that standards for venipunctures are the very same for doctors and Phlebotomists, I am qualified to testify to the standard of care applicable to the Phlebotomist, who performed the subject blood draw on Dana Mobius.

(Doc. 89-3 at 3, ¶¶ 3-4.)

He further averred that he was "fully trained in performing all types of venipunctures, including blood draws, starting IVs, and intravenous injections" during his medical training. *Id.* ¶ 5. According to his March 2023 Declaration, Dr. Blauzvern has used these skills throughout his career, including by "routinely" starting and inserting IVs in his current practice, "which is essentially the same technique as blood draw, as both require a venipuncture." *Id.* at 4, ¶ 6. Because his work with CRPS patients requires him to be aware of the causes of CRPS, "including negligently performed venipunctures[,]" his "practice requires that [he] be cognizant of the standards of care concerning blood draws, in order to recognize the causative effects of deviations from due care, which result in certain conditions, such as CRPS." *Id.* ¶ 7.

A.   **Whether to Strike Dr. Blauzvern's March 2023 Declaration.**

Defendants contend that the court should strike the March 2023 Declaration as a "sham affidavit" contradicting Dr. Blauzvern's deposition testimony or as an improper supplemental expert report. (Doc. 91 at 5.) The "sham issue of fact" doctrine "prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony." *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (internal quotation marks omitted). As applied to expert witness affidavits, "a sham issue of fact exists only when the contradictions in an expert witness's testimony are inescapable and unequivocal in nature." *In re Fosamax Prods. Liab. Litig.*, 707 F.3d at 194.

Defendants argue that Dr. Blauzvern's deposition testimony that it is "very rare" for physicians in his current practice, including himself, to perform blood draws (Doc. 75-5 at 12) is contradicted by his statement in the March 2023 Declaration that he is "routinely required to start and insert IVs, which is essentially the same technique as blood draw[s]." (Doc. 89-3 at 4, ¶ 6.) The latter statement does not contradict his

deposition testimony. Dr. Blauzvern testified that although physicians in his practice rarely perform blood draws, "we do start IVs . . . , which is basically the same technique." (Doc. 75-5 at 12.) Regardless of whether this testimony is accurate in terms of whether IVs and blood draws involve the same technique, there is no direct contradiction.

Defendants also contend that Dr. Blauzvern's deposition testimony is contradicted by the statement in his March 2023 Declaration that "[a]nesthesiologists, such as myself, . . . regularly perform such blood draws." (Doc. 89-3 at 3, ¶ 3.) Whether this statement contradicts his earlier testimony is more ambiguous, as it could refer either to Dr. Blauzvern's own practice, in which he testified he rarely performs blood draws, or to the practice of anesthesiologists generally. Due to this ambiguity, the March 2023 Declaration does not unequivocally contradict Dr. Blauzvern's deposition testimony.

Pointing to Dr. Blauzvern's testimony during his deposition that phlebotomists have different qualifications and positions than doctors or nurses, Defendants note that his March 2023 Declaration states that "medical professionals of all types must follow the same standard of care when conducting such venipunctures, including blood draws. Thus, a Phlebotomist must adhere to the very same protocol and standard of care as I do as an Anesthesiologist." (Doc. 89-3 at 3, ¶ 4.) Defendants do not explain why or how the occupational and educational differences between phlebotomists and physicians should result in their adherence to different standards of care for blood draws. Any contradiction between Dr. Blauzvern's deposition testimony and the March 2023 Declaration therefore does not rise to the level of a sham affidavit.

Even if it is not a sham affidavit, whether the March 2023 Declaration constitutes an improper Fed. R. Civ. P. 26(e) supplemental disclosure merits close consideration. Rule 26(e) requires parties to supplement their Rule 26(a) expert disclosures in a timely manner "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing" or "as ordered by the court." Fed. R. Civ. P. 26(e)(1)(A)-(B). "Like most duties, it exists for the

benefit of the opposing party, not the proffering one." *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 2366854, at *3 (S.D.N.Y. Mar. 6, 2023). An expert thus may not use Rule 26(e) supplementation as a guise for merely reiterating opinions from his or her initial report or adducing previously available information to strengthen those opinions. Rather, "[i]t is only if the expert subsequently learns of information that was previously unknown or unavailable, that renders information previously provided in an initial report inaccurate or misleading because it was incomplete, that the duty to supplement arises." *S.W. v. City of New York*, 2011 WL 3038776, at *2 (E.D.N.Y. July 25, 2011) (internal quotation marks omitted) (quoting *Sandata Techs., Inc., v. Infocrossing, Inc.*, 2007 WL 4157163, at *3-4 (S.D.N.Y. Nov. 16, 2007)).

Although the parties have not submitted Dr. Blauzvern's expert report to the court, Dr. Blauzvern's initial Declaration executed January 3, 2022 discusses his qualifications in general terms. It provides no details about his familiarity with venipuncture standards, although he testified in deposition that he learned how to perform blood draws and start IVs during his medical training. The March 2023 Declaration provides a much more extensive discussion of Dr. Blauzvern's familiarity with venipuncture standards.[2] Even if it addresses related matters, none of the information provided in the March 2023 Declaration was "previously unknown or unavailable" to Dr. Blauzvern such that his initial report was rendered inaccurate or misleading. *S.W.*, 2011 WL 3038776, at *2.

---

[2] Dr. Blauzvern's testimony reflected uncertainty regarding how blood draws are typically performed:

Q. Is there a specific order of the non-preferential veins in performing a venipuncture?

. . .

A. Usually [they] will go to the lateral antecubital fossa to pick up -- I think it's the -- the basilic or the cephalic over on that side. But -- but yeah. I mean, that's -- typically -- typically they will look for veins in -- in the antecubital fossa, either medial or lateral.

Q. In the lateral portion of the arm, is that the basilic or the cephalic vein, Doctor?

A. I don't remember at this point which one of those two it is.

(Doc. 75-5 at 22-23.)

"Rule 26(e) does not give parties a free pass to supplement expert reports whenever they want to." *In re Terrorist Attacks*, 2023 WL 2366854, at *3 (alteration adopted) (internal quotation marks omitted) (quoting *Sandata Techs.*, 2007 WL 4157163, at *4); *see also Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 278 (S.D.N.Y. 2011) ("[E]xperts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions.") (internal quotation marks omitted). Both the timing and content of the March 2023 Declaration, which is specific to the criticisms raised in Defendants' motion to strike, suggest that Plaintiffs seek to use it to bolster Dr. Blauzvern's initial opinions. The March 2023 Declaration is thus not appropriate supplementation under Rule 26(e).

Because preclusion of even an improper expert report may "be a harsh sanction[,]" *id.* (internal quotation marks omitted), courts must consider the following factors when determining whether to strike an improper expert report: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997) (citing *Outley v. City of New York*, 837 F.2d 587, 590-91 (2d Cir. 1988)).

With regard to the first *Outley* factor, Plaintiffs provide no explanation for their improper supplementation of Dr. Blauzvern's report. The first *Outley* factor thus weighs in favor of Defendants' requested sanction.

With respect to the second *Outley* factor, as Dr. Blauzvern's liability opinion is "central to the merits of this case and addresses issues in this case which require expert testimony[,]" the question of its admissibility is an important one. *Allen v. Dairy Farmers of Am., Inc.*, 2013 WL 211303, at *3 (D. Vt. Jan. 18, 2013). The March 2023 Declaration's discussion of the applicable standard of care and his qualifications to opine on that standard is significant due to its possible impact on the court's decision to admit his expert testimony. Its importance to the merits of Plaintiffs' case weighs in favor of

denying Defendants' request to strike. *See Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,* 571 F.3d 206, 213 (2d Cir. 2009) (trial court abused its discretion in excluding expert opinion for noncompliance with pretrial order where, among other things, "the testimony of [the excluded expert] was critical to [the defendant's] defense on the issue of causation."); *see also Dairy Farmers of Am.*, 2013 WL 211303, at *3 (finding rebuttal report's importance on the merits weighed in favor of denying motion to strike).

Pursuant to the third *Outley* factor, where an expert report is produced after discovery is complete, "[c]ourts routinely find prejudice" because "the opposing party has no opportunity to depose the expert concerning his new opinions or produce rebuttal reports" absent "time consuming and expensive discovery continuances." *In re Terrorist Attacks*, 2023 WL 2366854, at *5 (alteration adopted) (internal quotation marks omitted). By "effectively sandbagging" Defendants with additional evidence which appears intended to "create a genuine issue of material fact on the eve of summary judgment[,]" *id.* (internal quotation marks omitted), Plaintiffs' improper supplementation of Dr. Blauzvern's opinion prejudices Defendants. Any prejudice in admitting the March 2023 Declaration is mitigated by Defendants' ability to address the affidavit in their reply brief. The lack of significant contradictions between Dr. Blauzvern's deposition testimony and the March 2023 Declaration also reduces any prejudice. Defendants had the opportunity to depose Dr. Blauzvern. They were aware at that time that his qualifications as an expert regarding the applicable standard of care would be a key issue. They did not, however, have an opportunity to question him about his March 2023 Declaration. The third *Outley* factor is thus in equipoise.

Finally, with regard to the fourth *Outley* factor, a continuance is not in the best interests of this litigation. This action has been pending for five years. *See Softel, Inc.*, 118 F.3d at 963 ("[T]he enormous length of every step of the proceedings in this case militated against any more continuances."). Granting a continuance for Defendants to re-depose Dr. Blauzvern would result in further "significant[] delay[] [of] the adjudication of the merits of this dispute." *Dairy Farmers of Am.*, 2013 WL 211303, at

*4. The final *Outley* factor weighs in favor of excluding the March 2023 Declaration.

On balance, the *Outley* factors weigh against admitting the March 2023 Declaration as improper expert witness supplementation. The court therefore GRANTS Defendants' request to strike it for purposes of ruling on summary judgment.

### B.   Whether Dr. Blauzvern is Qualified as an Expert Witness Under Rule 702.

Defendants contend that Dr. Blauzvern is not qualified to provide an expert opinion regarding the standard of care applicable to Ms. Mobius's negligence claim. The admissibility of expert testimony is governed by Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 obligates the court to serve as a gatekeeper for expert testimony, ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the testimony complies with Rule 702's requirements. *See id.* at 593 n.10 ("Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence . . . should be established by a preponderance of proof.") (internal quotation marks omitted).

Whether a witness is qualified as an expert by his knowledge, skill, experience, training, or education is a "threshold question" that the court must resolve before determining whether his or her opinions are admissible. *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005). "The initial question of whether a witness is qualified to be an 'expert' is important, among other reasons, because an 'expert' witness is permitted substantially more leeway than 'lay' witnesses in testifying as to opinions that are not 'rationally based on [his or her] perception[.]'" *Id.* (first alteration in original)

(quoting *United States v. Garcia*, 291 F.3d 127, 139 n. 8 (2d Cir. 2002)).

"Courts within the Second Circuit have liberally construed expert qualification requirements when determining if a witness can be considered an expert." *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 328 (S.D.N.Y. 2022) (internal quotation marks omitted). Generally, "[a]ssertions that the witness lacks particular educational or other experiential background, 'go to the weight, not the admissibility, of [the] testimony.'" *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (second alteration in original)).

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). An expert "need not be a specialist in the exact area of medicine implicated by the plaintiff's injury," but "he must have relevant experience and qualifications such that whatever opinion he will ultimately express would not be speculative." *Loyd v. United States*, 2011 WL 1327043, *5 (S.D.N.Y. Mar. 31, 2011) (internal citations and quotation marks omitted). Where an expert witness's "expertise is too general or too deficient[,]" the court "may properly conclude that witnesses are insufficiently qualified despite the relevance of their testimony[.]" *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).

Plaintiffs argue that a physician specializing in one area of medicine may testify as an expert witness regarding a different medical specialty provided the witness demonstrates sufficient familiarity with the relevant subject and standard of care.[3]

---

[3] *See, e.g.*, *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion*, 345 F.3d 15, 24 (1st Cir. 2003) ("The mere fact that Dr. Rodriguez was not a gynecologist does not mean that he was not qualified to give expert testimony regarding Gaydar's pregnancy. The proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline."); *I.M. v. United States*, 362 F. Supp. 3d 161, 197-98 (S.D.N.Y. 2019) ("The Court is not aware of a case in the Second Circuit holding that a doctor in a specialty cannot testify as an expert about nursing in that same specialty[.]"); *Est. of Sumrall v. Singing River Health Sys.*, 303 So. 3d 798, 806 (Miss. Ct. App. 2020) (holding expert doctor was

Defendants do not, however, argue that an anesthesiologist is never qualified to testify regarding phlebotomy. Rather, they contend that Dr. Blauzvern's training, education, and experience do not qualify *him* as an expert on phlebotomy. Regardless of whether "numerous other medical providers [such as anesthesiologists] routinely perform phlebotomy services[,]" *Baptist Healthcare Sys., Inc. v. Miller*, 177 S.W.3d 676, 681 (Ky. 2005), the issue is whether Dr. Blauzvern is qualified to provide a helpful opinion to the jury on the standard of care in 2015 for venipuncture in New York.[4]

Defendants compare Dr. Blauzvern's qualifications with those of their expert witness Cathy Coyle and assert that Ms. Coyle's extensive phlebotomy education and experience demonstrate that Dr. Blauzvern is not similarly qualified. The fact that Ms. Coyle appears to be well qualified does not mean that Dr. Blauzvern is not qualified.

_____

qualified to testify as to applicable standard of care where "the record before [the court] [was] devoid of any evidence showing that a medical doctor would remove a patient's central line differently than a registered nurse" and expert "demonstrated 'satisfactory familiarity' with the procedure required") (alteration adopted).

[4] Under New York law, "[t]o establish a claim of medical malpractice, a plaintiff must prove by a preponderance of the evidence: '(1) the standard of care in the locality where the treatment occurred, (2) that the defendants breached that standard of care, and (3) that the breach of the standard was the proximate cause of injury.'" *K.R. ex rel. Perez v. United States*, 843 F. Supp. 2d 343, 355 (E.D.N.Y. 2012) (internal quotation marks omitted).

> Under the first element, the general standard of care for physicians in New York is well established and requires a physician to "exercise that reasonable degree of learning and skill that is ordinarily possessed by physicians . . . *in the locality where he practices*. . . . The law holds [the physician] liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment."

*Id.* (emphasis supplied) (omissions in original) (quoting *Perez v. United States*, 85 F. Supp. 2d 220, 226 (S.D.N.Y. 1999)). The parties may, however, introduce evidence establishing that the standard of care in a locality is the same as the standard of care nationally. *See, e.g., McCullough v. Univ. of Rochester Strong Mem'l Hosp.*, 794 N.Y.S.2d 236, 237 (N.Y. App. Div. 2005) ("A court may deviate from applying the locality rule and instead apply a minimum statewide standard of care or even a nationwide standard of care[.]") (internal citations omitted); *Greasley v. United States*, 2021 WL 935731, at *25 (W.D.N.Y. Mar. 11, 2021) (admitting expert who was not board-certified in New York because he testified that his opinions in medical malpractice action were based on national standards for general emergency room treatment). Here, plaintiffs seek to introduce Dr. Blauzvern's opinion that the phlebotomy standard of care is a national one.

Plaintiffs point to his medical education and practical experience as an anesthesiologist, as well as his testimony that he considers conducting blood draws to be "just a very routine kind of thing" (Doc. 75-5 at 13), although he rarely performs them himself. Dr. Blauzvern has not worked with, observed, or supervised phlebotomists conducting blood draws in his practice. When questioned regarding the order of preference among arm veins for a phlebotomist performing venipuncture, Dr. Blauzvern stated that he "think[s] that's going to depend on the phlebotomist, but most are going to use the antecubital vein." *Id.* at 22. He could not remember the order of "non-preferential veins" when performing a blood draw. *Id.* at 22.

Dr. Blauzvern also noted that, as an anesthesiologist, he often starts IVs, a procedure which he claims utilizes the same techniques as blood draws. Although he did not believe phlebotomists insert IVs and had "never had one do that[,]" he also explained that "[y]ou would always use a tourniquet for insertion of an IV unless it's a . . . major trauma going on[.]" *Id.* at 34. He explained that the importance of using a tourniquet is that "[y]ou can't palpate the vein without a tourniquet there." *Id.* Defendants adduce no evidence contradicting Dr. Blauzvern's equation of starting IVs and performing blood draws. Nor do Defendants present any evidence contradicting his sworn statements that the standard of care for blood draws is the same nationwide.

Dr. Blauzvern's venipuncture training and practice are admittedly dated and more recently have been focused almost exclusively on starting IVs. His medical education and thirty years of practical experience, however, provide him with specialized "knowledge, skill, experience, training, or education" regarding the 2015 nationwide standard of care for starting IVs. Fed. R. Evid. 702.

"[B]ecause a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely*, 414 F.3d at 399 n.13. However, "[i]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa*

*Prods. Liab. Litig.*, 489 F. Supp. 2d at 282. In light of the Second Circuit's "liberal" construction of Rule 702's qualification requirements, Dr. Blauvzern is qualified to testify regarding his experience starting IVs, the similarities between starting IVs and blood draws, and his opinion that venipuncture standards of care are nationwide. *Lickteig*, 589 F. Supp. 3d at 328. He may further testify that Defendants breached the standard of care in performing Ms. Mobius's blood draw. Defendants' contention that Dr. Blauvzern lacks practical experience specific to blood draws go to his "testimony's weight and credibility—not its admissibility." *McCullock*, 61 F.3d at 1043. On cross-examination, Defendants have wide latitude to explore Dr. Blauzvern's "alleged shortcomings." *Id.*

For the reasons stated above, Defendants' motion to strike is therefore GRANTED IN PART and DENIED IN PART.

## II.    Defendants' Motion for Summary Judgment.

Arguing that Plaintiff cannot establish the required elements of her medical malpractice claim without Dr. Blauzvern's expert testimony, Defendants seek summary judgment in their favor on all of Plaintiffs' claims. Because the court is sitting in diversity, Plaintiffs' claims are governed by New York law. *See Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.").

### A.    Standard of Review.

The court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the non-moving party" and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97,

107 (2d Cir. 2019) (internal quotation marks omitted). There is no genuine dispute where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "Once the moving party demonstrates that there are no genuine issues of material fact, the nonmoving party must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotation marks omitted) (alteration in original). "Thus, a nonmoving party can defeat a summary judgment motion only by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Id.* at 166-67 (internal quotation marks omitted) (alterations in original).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted). "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita*, 475 U.S. at 586). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). However, if the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Id.* at 251-52. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Kaytor*, 609 F.3d at 545 (internal quotation marks and

emphasis omitted).

**B.    The Undisputed Facts.**

Ms. Mobius's rheumatologist, Karen Krutchick, M.D., treats Ms. Mobius for lupus. In 2015, Dr. Krutchick ordered a blood draw for Ms. Mobius, who underwent a blood draw at a Quest Patient Service Center on November 2, 2015. According to Ms. Mobius, the Quest phlebotomist who performed the blood draw, Kari Fistola,[5] did not put a tourniquet on her arm before performing the draw. Unlike in prior blood draws taken from the same area of the antecubital fossa near Ms. Mobius's elbow joint, Ms. Fistola drew blood from the top of Ms. Mobius's left forearm, closer to her wrist than to her antecubital fossa.

Ms. Mobius looked away as Ms. Fistola inserted the needle and did not see the needle go into her arm. When the needle was inserted, Ms. Mobius felt a "shock-like sensation" throughout her body (Doc. 75-3 at 18), as well as "stinging, burning[,]" and "[a] throbbing in [the] area" of the needle. *Id.* at 20. The shock was "very intense[,]" causing her to "scream[] out" and "cr[y] out." *Id.* at 19. Although the shock sensation improved over the subsequent days, Ms. Mobius continued to experience stinging, burning, and throbbing sensations in her forearm. Two weeks later, Mr. Mobius called Quest to complain about his wife's experience during the November 2, 2015 blood draw. He later called a second time to report the incident in 2016.

In January 2016, Ms. Mobius experienced increasing pain and continued burning, stinging, and pressure in her left forearm, which became swollen "throughout . . . , pushing up into [her] elbow." *Id.* at 25. She was subsequently diagnosed with Reflex Sympathetic Dystrophy ("RSD") or CRPS by Dr. Krutchick, as well as by a vascular doctor, Dr. Karamanoukian; a neurologist, Dr. Silvestri; and a pain management doctor, Dr. Waghmarae. According to Ms. Mobius, since 2016 her CRPS has spread to other parts of her body, including her right arm, both legs, and throat, tongue, and sinus area, which she asserts her doctors attribute to the November 2, 2015 blood draw. Since late

---

[5] The parties have also identified the witness's last name as "Fistula."

2017, she has continued to experience "the same pain symptoms, throbbing, burning, stinging, swelling, [and a] sense of bleeding in th[e] spot where the needle had been." *Id.* at 41.

### C.   The Disputed Facts.

The parties dispute whether Ms. Fistola used a tourniquet when she drew Ms. Mobius's blood on November 2, 2015. Defendants' expert witness Ms. Coyle interviewed Ms. Fistola and reviewed Plaintiffs' depositions, discovery disclosures, and medical records. She opined that although Ms. Fistola does not remember the November 2, 2015 blood draw, Ms. Fistola "can attest based on her habit and custom that all Quest policies and standard operating procedures were followed." (Doc. 75-6 at 3.) Ms. Fistola's usual practice included registering the patient, verifying the patient's insurance, and entering the test codes, before seating the patient in the phlebotomy chair, checking both arms for suitable veins, selecting a vein, using a tourniquet, cleaning the area, and performing the venipuncture. Despite not recalling the specific blood draw, Ms. Fistola "is absolutely certain that she used a tourniquet[.]" *Id.* Based on Ms. Fistola's description of her normal practice, Ms. Coyle concluded that "Ms. Fistola complied with the standard of care in performing the blood draw of Ms. Mobius." *Id.* at 4. She further opined that Defendants' "[v]enipuncture standard operating procedure complied with the standard of care." *Id.*

Plaintiffs argue that Ms. Mobius's testimony that Ms. Fistola did not use a tourniquet contradicts Ms. Coyle's expert testimony. They assert that because Ms. Coyle's expert opinion is based on inadmissible habit evidence from an "undisclosed, unilateral interview" with Ms. Fistola. (Doc. 89-8 at 13), under New York law it cannot be considered by the court in deciding Defendants' motion for summary judgment.

Under Fed. R. Evid. 406, "[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." "Habit" is a "specific" concept which "describes one's regular response to a repeated specific situation." *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 125 (2d Cir. 2016). It

describes actions that are "semi-automatic." Advisory Committee Notes, 1972 Proposed Rules, Fed. R. Evid. 406 (internal quotation marks omitted).

Under Fed. R. Evid. 703, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." The Second Circuit has held that "expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions[.]" *United States v. Dukagjini*, 326 F.3d 45, 57 (2d Cir. 2003) (internal quotation marks omitted); *see also* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). A party may not, however, "call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013). For this reason, "an expert witness may rely on hearsay evidence while reliably applying expertise to that hearsay evidence, but may not rely on hearsay for any other aspect of his testimony." *Dukagjini*, 326 F.3d at 58.

An expert witness may opine on a medical provider's possible malpractice by relying on an interview with or deposition testimony from that provider. Ms. Coyle's opinion reviews Ms. Fistola's statements about her normal practice and concludes that Ms. Fistola complied with the relevant standard of care. Because it is permissible for Ms. Coyle to rely on hearsay for this purpose, she is not serving merely as a "conduit" for Ms. Fistola's testimony and her opinion need not be excluded on that basis. *Marvel Characters*, 726 F.3d at 136.

According to Ms. Coyle, Ms. Fistola became trained in phlebotomy in 2006 and has worked as a phlebotomist since then. She has completed annual compliance training and an annual certification process. Ms. Coyle opined that phlebotomists conduct multiple blood draws every day. Ms. Fistola provided a step-by-step description of her venipuncture process to Ms. Coyle and indicated she followed the same steps every time. Her statement that there are "very few instances" in which a tourniquet is not used indicates that cases in which she does not do so are rare. (Doc. 75-6 at 3.) Although Ms.

Fistola explained that her choice of venipuncture location ultimately depends on the availability and location of a suitable vein, indicating some patient-to-patient variation within her procedure, this variation is limited by the hierarchy of preferred veins in Defendants' Venipuncture Standard of Care.

Ms. Fistola's typical venipuncture procedure is consistent enough to "establish the degree of specificity and frequency of uniform response that ensures more than a mere tendency to act in a given manner, but rather, conduct that is semiautomatic in nature." *LeClair v. Raymond*, 2022 WL 219609, at *5 (N.D.N.Y. Jan. 25, 2022) (internal quotation marks omitted). This testimony should, however, come from Ms. Fistola in the first instance as the person with the personal knowledge of her habits. The possibility of slight variations between patients in Ms. Fistola's normal practice is proper fodder for cross-examination. As habit evidence is admissible under Fed. R. Evid. 406 with a proper foundation, it may be considered on summary judgment. *See Picard Tr. for SIPA Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs. LP*, 49 F.4th 170, 181 (2d Cir. 2022) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," and a "district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence.") (alteration in original) (internal quotation marks omitted) (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009). *But see Celotex*, 477 U.S. at 324 (observing that evidence produced by the nonmoving party need not be "in a form that would be admissible at trial in order to avoid summary judgment").

Assuming Ms. Fistola's habit evidence is admissible at trial, there remains a disputed issue of fact as to whether she complied with the standard of care when performing Ms. Mobius's blood draw.

> **D.    Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Medical Malpractice Claim.**

Under New York law, "[t]he essential elements of medical malpractice are (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury[.]" *Scopelliti v. Westmed Med. Grp.*, 146

N.Y.S.3d 656, 658 (N.Y. App. Div. 2021) (internal quotation marks omitted). Because "[a]n error in medical judgment by itself does not give rise to liability for malpractice[,]" a plaintiff "must show by a preponderance of the evidence that the medical professionals treating [him or her] failed to conform to accepted community standards of practice." *Greasley v. United States*, 2021 WL 935731, at *6 (W.D.N.Y. Mar. 11, 2021) (internal citations and quotation marks omitted).

"[U]nless the deviation from the proper standard of care is so obvious as to be within the understanding of an ordinary layperson[,]" the plaintiff must establish each element of his or her claim "by expert medical opinion[.]" *Id.*; *see also Sitts v. United States*, 811 F.2d 736, 739-740 (2d Cir. 1987) (noting that "in the view of the New York courts, the medical malpractice case in which no expert medical testimony is required is 'rare'"); *Fiore v. Galang*, 478 N.E.2d 188, 189 (N.Y. 1985) ("[E]xcept as to matters within the ordinary experience and knowledge of laymen, in a medical malpractice action, expert medical opinion evidence is required to demonstrate merit[.]").[6]

In this case, Plaintiffs assert that Ms. Fistola failed to use a tourniquet and did not comport with the standard of care. They rely on Dr. Blauzvern for his expert opinion that blood draws and IVs involve the same procedure and there is a national standard of care. Plaintiffs point out that Ms. Mobius's injuries have no other origin. In the light most favorable to Plaintiffs, this evidence is sufficient to render the duty and standard of care a contested issue of fact.

---

[6] At least one court has found that the phlebotomy standard of care must be established by expert testimony. That court found:

> The phlebotomy process is extremely complex and involves language that is alien and technical. This process is not within the general purview of a common juror's knowledge, and without expert testimony on the standard of care common to the phlebotomy process, a trier of fact would not be able to understand the nature of the standard of care required by [d]efendant. As such, expert testimony is required to establish the applicable standard of care for [p]laintiff's phlebotomy and subsequent treatment.

*Cruz v. The Am. Nat'l Red Cross*, 2021 WL 1999084, at *3 (D. Kan. May 19, 2021), *aff'd sub nom. Cruz v. Am. Nat'l Red Cross*, 2022 WL 2813237 (10th Cir. July 19, 2022).

"A defendant 'moving for summary judgment dismissing a complaint alleging medical malpractice must establish, *prima facie*, either that there was no departure [from the standard of care in the community] or that any departure was not a proximate cause of the plaintiff's injuries.'" *Kurtz v. Hansell*, 2023 WL 2648190, at *20 (S.D.N.Y. Mar. 27, 2023) (alteration in original) (quoting *Gillespie v. N.Y. Hosp. Queens*, 947 N.Y.S.2d 148, 150 (N.Y. App. Div. 2012)). Once the defendant makes the requisite prima facie showing, "the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden[.]" *Gillespie*, 947 N.Y.S.2d at 150.

To establish its prima facie entitlement to summary judgment, the moving party may rely on "the submission of affidavits and/or deposition testimony and medical records which rebut [the] plaintiff's claim of malpractice with factual proof." *Kurtz*, 2023 WL 2648190, at *20 (internal quotation marks omitted); *see also Guido v. Fielding*, 134 N.Y.S.3d 34, 53 (N.Y. App. Div. 2020) ("A defendant makes a prima facie case of entitlement to summary judgment in a medical malpractice action by submitting an affirmation from a medical expert establishing that the treatment provided to the injured plaintiff comported with good and accepted practice or that the plaintiff was not injured thereby[.]"). The moving party may rely on expert testimony based on admissible habit evidence to satisfy their burden; however, "[e]vidence of habit only provides a basis for the jury to draw an inference[.]" *Id.* at 55. "[I]t cannot be the basis for judgment as a matter of law[,]" because a medical provider's usual practice "does not conclusively prove" that he or she followed that practice in the pending case. *Id.*

Defendants proffer Ms. Coyle's testimony regarding Ms. Fistola's venipuncture procedure to establish they did not depart from the standard of care in the community. Although Ms. Coyle's testimony may be admissible, New York courts apply strict standards in determining when a defendant may rely upon habit evidence to satisfy its prima facie case. In *Rivera v. Anilesh*, 869 N.E.2d 654, 659 (N.Y. 2007), the New York Court of Appeals found that the defendant dentist met her prima facie burden of proof on summary judgment where she presented an expert opinion reviewing her routine practice

and the "record . . . contain[ed] proof of a deliberate and repetitive practice[.]" 869
N.E.2d at 659 (internal quotation marks omitted). There, the defendant dentist "described
the specific procedure that she used when injecting an anesthetic and her expert
confirmed that this procedure was within the accepted standard of care for dentistry." *Id.*
at 658. "[N]o evidence suggest[ed] that [the dentist's] pre-extraction injection procedure
would vary from patient to patient depending on the particular medical circumstances or
physical condition of the patient." *Id.* at 658-59; *Rigie v. Goldman*, 543 N.Y.S.2d 983,
984 (N.Y. App. Div. 1989) (permitting testimony of dentist that he "[i]nvariably" gave a
particular warning to patients before they underwent wisdom tooth surgery).

As in *Rivera*, Ms. Fistola "provided a step-by-step description of the procedure she
used" to perform blood draws, *Rivera*, 869 N.E.2d at 632, and Ms. Coyle opined that Ms.
Fistola's treatment of Ms. Mobius was within the applicable phlebotomy standard of care.
Unlike the *Rivera* defendant, however, Ms. Fistola's choice of vein varied between
patients, albeit within certain limits, and she admitted that on rare occasions she may not
use a tourniquet. *Guido*, 134 N.Y.S.3d at 54 (holding doctor's testimony regarding his
routine practice was insufficient basis for defendant's prima facie case because doctor
failed to lay a foundation proving that his surgical practice "did not vary from patient to
patient"). An issue of fact thus exists as to whether "the practice described by [Ms.
Fistola] was followed by [her] in this particular case[.]" *Id.* at 55. ("The fact that [the
defendant surgeon] usually inspects and palpates a patient's bowel does not conclusively
prove that he did so on this occasion.").

Because there is a disputed issue of fact as to how Ms. Mobius's blood was drawn
and whether that breached an applicable standard of care, Defendants are not entitled to
judgment as a matter of law on Plaintiffs' medical malpractice claim and their motion for
summary judgment on that claim (Count I) is DENIED.

### E.     Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Failure to Obtain Informed Consent Claim.

New York Public Health Law § 2805-d codifies the elements which a plaintiff
alleging failure to obtain informed consent must prove at trial. Under that statute, "[t]he

right of action to recover for medical . . . malpractice based on a lack of informed consent is limited to those cases involving either (a) non-emergency treatment, procedure or surgery, or (b) a diagnostic procedure which involved invasion or disruption of the integrity of the body." N.Y. Pub. Health Law § 2805-d(2). To prevail on a lack of informed consent claim under § 2805-d, the plaintiff must "establish[] that a reasonably prudent person in the patient's position would not have undergone the treatment or diagnosis if he [or she] had been fully informed and that the lack of informed consent is a proximate cause of the injury or condition for which recovery is sought." *Id.* § 2805-d(3). "Lack of informed consent" is statutorily defined as "the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical, dental or podiatric practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation." *Id.* § 2805-d(1).

Despite seeking summary judgment in their favor on all of Plaintiffs' claims, Defendants' only argument is that the exclusion of Dr. Blauzvern's expert witness opinion entitles them to dismissal of the Complaint in its entirety. They do not address, nor is it readily apparent, how Dr. Blauzvern's testimony regarding the venipuncture standard of care bears on the issue of whether Defendants obtained Ms. Mobius's informed consent.

As the party moving for summary judgment, Defendants are "initially responsible for demonstrating the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 323). Having failed to fulfill their "initial responsibility of informing the district court of the basis for [their] motion[,]" Defendants are not entitled to summary judgment on Plaintiffs' failure to obtain informed consent claim. *Celotex Corp.*, 477 U.S. at 323; *see also* Fed. R. Civ. P. 56(c) ("A party asserting that a fact cannot be or is genuinely disputed *must support the assertion* by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute[.]")

23

(emphasis supplied). Defendants' motion for summary judgment as to Count II is therefore DENIED.

**F.    Whether Defendants Are Entitled to Summary Judgment on Plaintiff Hans Mobius's Loss of Consortium Claim.**

Under New York law, loss of consortium is a common law concept which "arises out of an injury to the marital relationship[.]" *Buckley v. Nat'l Freight, Inc.*, 681 N.E.2d 1287, 1288 (N.Y. 1997). It includes "not only loss of support or services of a husband or wife[,]" but also "such elements as love, companionship, affection, society, sexual relations, solace and more." *Goldman v. MCL Cos. of Chicago, Inc.*, 131 F. Supp. 2d 425, 427 (S.D.N.Y. 2000) (internal quotation marks omitted).

Loss of consortium is a derivative claim which "traditionally may be maintained pursuant to such common law torts as negligence[.]" *Fleming v. State*, 80 N.Y.S.3d 850, 853 (N.Y. Ct. Cl. 2018) (internal quotation marks omitted) (quoting *Goldman*, 131 F. Supp. 2d at, 427); *see also Goldman*, 131 F. Supp. 2d at 427 ("It is well established . . . that a loss of consortium claim is not an independent cause of action, but is derivative in nature, and may only be maintained where permitted pursuant to the primary tort.") (alteration adopted) (internal quotation marks omitted). "In contrast, 'where . . . a loss of consortium claim is purportedly derived from a statutory claim, courts must examine the statute at issue to determine whether it authorizes a spouse to bring a derivative action[.]'" *Fleming*, 80 N.Y.S.3d at 853 (alteration adopted) (quoting *Goldman*, 131 F. Supp. 2d at 427).

With regard to Plaintiffs' lack of informed consent claim, the parties cite no authority regarding whether New York courts have interpreted § 2805-d to authorize a spouse to bring a derivative action. At least one district court has found that a plaintiff could "recover loss of consortium damages for the medical malpractice and lack of informed consent claims" in New York, however, the court did not explain the basis for its decision. *Powers v. Mem'l Sloan Kettering Cancer Ctr.*, 2022 WL 874846, at *5 (S.D.N.Y. Mar. 24, 2022). Other state and federal courts applying New York law have addressed the issue only indirectly. *See, e.g., Mirshah v. Obedian*, 158 N.Y.S.3d 226, 232

(N.Y. App. Div. 2021) (holding that because lower court erred by granting summary judgment on informed consent claims, it also erred by granting summary judgment on derivative loss of consortium claims); *Ingutti v. Rochester Gen. Hosp.*, 44 N.Y.S.3d 274, 276 (N.Y. App. Div. 2016) (upholding lower court's decision to deny motion to dismiss derivative cause of action where the court properly denied motion to dismiss lack of informed consent claim); *Hazel v. Montefiore Med. Ctr.*, 663 N.Y.S.2d 165, 166 (N.Y. App. Div. 1997) (holding that where informed consent and medical malpractice claims were dismissed as time-barred, "[t]he cause of action for loss of consortium was also properly dismissed, since it is derivative of the other claims").

In the absence of controlling precedent as to whether New York's informed consent statute supports Mr. Mobius's loss of consortium claim, this court must predict the outcome under New York law. *See Cont'l Cas. Co. v. Pullman, Comley, Bradley & Reeves*, 929 F.2d 103, 105 (2d Cir. 1991) (finding that where a state's highest court has never decided the issue at bar, the court must "make [its] best estimate as to how [that state's] highest court would rule in this case") (internal citation omitted). Because § 2805-d does not expressly provide for or prohibit the recovery of derivative losses, the question is whether the legislative intent animating the statute otherwise supports such a claim. *See Alifieris v. Am. Airlines, Inc.*, 472 N.E.2d 303, 305 (N.Y. 1984) ("The guiding principle in such [statutory construction] cases is to give effect to the legislative intent and that intent is to be sought first in the words of the statute under consideration[.]").

The statute's plain language identifies a remedy only for patients undergoing certain "non-emergency treatment[s]" or "diagnostic procedure[s,]" § 2805-d(2). It "makes no provision for the families of those [patients]" whose informed consent was not sought. *Fleming*, 80 N.Y.S.3d at 853. Despite the codification of the informed consent cause of action, however, courts characterize lack of informed consent as a genre of medical malpractice claims. *See, e.g.*, *Figueroa-Burgos v. Bieniewicz*, 23 N.Y.S.3d 369, 372 (N.Y. App. Div. 2016) (explaining elements of "the cause of action in negligent malpractice for failure to inform"). Because loss of consortium claims are traditionally derived from "such common law torts as negligence," *Fleming*, 80 N.Y.S.3d at 853, and

25

"medical malpractice is but a species of negligence[,]" *Weiner v. Lenox Hill Hosp.*, 673
N.E.2d 914, 916 (N.Y. 1996), it follows that § 2805-d supports a derivative claim for loss
of consortium.

Because Defendants are not entitled to summary judgment on Plaintiffs' medical
malpractice or informed consent claims, they also fail to establish that, as a matter of law,
Mr. Mobius cannot maintain a derivative loss of consortium claim associated with his
wife's claims. Defendants' motion for summary judgment as to the loss of consortium
claim (Count III) is therefore DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' motion to strike Plaintiffs' expert Neal
Blauzvern is GRANTED IN PART and DENIED IN PART. Defendants' motion for
summary judgment is DENIED. (Doc. 75.)

SO ORDERED.

Dated this ___18th___ day of August, 2023.

Christina Reiss, District Judge
United States District Court